# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 23-945V**
**Filed: June 12, 2026**

|  |  |
|---|---|
| ELIZABETH POMALES-RODRIGUEZ,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Nina Ren, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION[1]

On June 23, 2023, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that she suffered a Table Injury of a shoulder injury related to vaccine administration ("SIRVA") affecting her right shoulder and following an influenza ("flu") vaccination she received on October 8, 2021. (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is *not* entitled to compensation.

## I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-11(c)(1)(C)(i); § 300aa-13(a)(1); § 300aa-14(a).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of vaccine administration. § 300aa-14(a), *amended by* 42 C.F.R. § 100.3. Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(c). To be considered a "Table SIRVA," a petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i)    No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii)    Pain occurs within the specified time-frame;
>
> (iii)    Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

2

> (iv)    No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa-13(a)(1). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence . . . ." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record. Vaccine Rule 3(b)(2). However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II.    Procedural History

Based on the allegations of the petition, which was accompanied by medical records and a written statement marked as Exhibits 1-7, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU").  (ECF Nos. 1, 8-9.)  However, respondent filed a Rule 4(c) Report recommending against compensation in February of 2024, contending that petitioner could not meet the third and fourth SIRVA criteria because she did not experience reduced range of motion and her symptoms would be explained by neuralgia.  (ECF No. 15.)  The case was then transferred out of the SPU in April of 2024.  (ECF Nos. 16-17.)

Subsequently, in June of 2024, petitioner filed an expert report by Naveed Natanzi, D.O.  (ECF No. 18; Exs. 8-31.)  In September of 2024, petitioner filed confirmation of her Vaccine Adverse Event Reporting System ("VAERS") report.  (ECF No. 24; Ex. 32.)  Respondent filed a responsive expert report by Paul Cagle, M.D., in October of 2024.  (ECF No. 25; Exs. A-B.)  Petitioner then filed a supplemental report by Dr. Natanzi responding to Dr. Cagle's report.  (ECF No. 26; Ex. 33.)  Thereafter, the parties advised in a joint status report that the case is ripe for resolution of entitlement based on written briefs (ECF No. 27), and the then-presiding Special Master set a briefing schedule.

The case was reassigned to the undersigned in February of 2025 (ECF Nos. 28-29), and petitioner subsequently filed her motion for a ruling on the written record on March 14, 2025.  (ECF No. 30.)  Respondent filed his response on March 27, 2025 (ECF No. 31), and petitioner did not file any reply.  I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, petitioner's motion is now ripe for resolution.

In her motion, petitioner argues that she has met the four QAI criteria necessary to demonstrate the presence of a Table SIRVA.  (ECF No. 30, pp. 7-11.)  She has not presented any alternative argument based on causation-in-fact (and indeed causation-in-fact was not pleaded in the petition).  In response, respondent argues that petitioner cannot meet the third SIRVA QAI requirement, both because she did not have reduced range of motion and also because she reported pain outside the shoulder.  (ECF No. 31, pp. 4-5.)  Additionally, respondent argues more broadly that petitioner has not actually preponderantly demonstrated the presence of any shoulder injury at all.  (*Id*. at 5, 7.)

## III.    Factual Summary

Petitioner received the flu vaccination at issue in her right deltoid on October 8, 2021.  (Ex. 1, p. 1; Ex. 2, pp. 35-36.)  She reported injection site pain and pain down her right arm and a VAERS report was submitted the same day.  (*Id*.)  Respondent agrees that petitioner had no prior shoulder complaints.  (ECF No. 31, p. 2.)

4

Eighteen days later, petitioner presented to her primary care provider with a chief complaint of pain in her right arm.  (Ex. 2, p. 31.)  The handwritten record of this encounter is spartan.  (*See id.*)  The physical exam portion notes only "R arm neuropathy" and both the musculoskeletal and neurological exam prompts are left blank.  (*Id.*)  The assessment was right arm pain, also noted to be neuropathy, secondary to injection of a flu vaccine.  (*Id.*)  Petitioner was referred to a neurologist. (*Id.*)

Petitioner then presented to a neurologist on November 1, 2021, for "nerve pain after flu shot."  (Ex. 2, pp. 28-30.)  Petitioner presented the history as depicted below:

> Patient is a 60 year old who is having lingering radiating pain down her right arm to her shoulder, forearm and right hand and fourth and fifth digit, after receiving a flu shot a month ago. Presently it is a deep aching pain. Reports when she touches the area of the injection there is some pain. When she uses her right arm a lot, the symptoms get aggravated. Denies any history of neck pain. Has some difficulty with urination and bowel control. Notes after a while, she will have to use her left hand due to the tingling. Denies any bleeding or redness right after the injection. Notes her symptoms have lessened. pain was upon onset immediately with teh injection

(*Id.* at 28.)

The neurologist's physical exam indicated normal strength, intact sensation, and a lack of tenderness over the injection site.  (Ex. 2, p. 28.)  Petitioner was noted to have active range of motion of the shoulder.  (*Id.*)  The neurologist explained that post-injection pain can result from direct needle trauma as well as chemical irritation, toxicity, or fibrotic changes leading to neuritis.  (*Id.* at 29.)  However, he was unsure of any direct nerve injury and further noted that he "can not [sic] rule out musculoskeletal injury," including tendinitis, which he placed in the differential diagnosis.  (*Id.*)  Petitioner was started on gabapentin for nerve pain; however, the neurologist also recommended an orthopedic evaluation.  (*Id.*)

Petitioner returned to the neurologist on January 25, 2022.  (Ex. 3, p. 4.)  She again reported "lingering radiating pain down her right arm to her shoulder, forearm and right hand and fourth and fifth digit, after receiving a flu shot."  (*Id.*)  It was noted that petitioner was seeing some mild, gradual improvement, but she complained of residual, deep aching pain.  (*Id.*)  On exam, petitioner was noted to have good range of motion of the neck, as well as active range of motion of her shoulder.  (*Id.*)  Petitioner had full

muscle strength, except that it was noted that "there is giveway[3] when testing right delotid [sic]." (*Id*.)  A nerve conduction study was nondiagnostic.  (*Id*. at 5.)  The neurologist assessed "nerve pain," but explained that he remained concerned that a musculoskeletal injury or tendinitis remained in the differential diagnosis.  He noted that petitioner's presentation "does not exactly follow typical neurologic distribution" and indicated that petitioner had moderate median neuropathy at the wrist, evidenced by her nerve conduction study, that could separately explain the symptoms affecting her hand. (*Id*.)  The neurologist agreed with petitioner's request for physical therapy, but also again recommended an orthopedic evaluation.  (*Id*.)

Petitioner returned to her primary care provider for routine care on February 3, 2022.  (Ex. 2, p. 18.)  Her right arm neuropathy was noted to have improved with rest and documented as stable, though it was also noted that petitioner would be treating with physical therapy.  (*Id*.)  Petitioner presented for an initial physical therapy evaluation on April 19, 2022.[4]  (Ex. 4, pp. 42-45.)  Petitioner indicated that "I got a flu shot and it sent numbness and pain down the arm.  It has improved a great deal . . . The pain started immediately after the flu shot . . . she reports the nurse administering the flu shot may have gotten too close to the triangle and hit her nerve."  (*Id*. at 42.)  The physical therapist documented that petitioner had reduced range of motion.  (*Id*. at 43-44.)

The remainder of the medical records are less helpful in resolving the issues presented herein.  Petitioner's signed statement does not characterize the nature of her alleged shoulder injury.  (Ex. 5.)

---

[3] Although the undersigned recognizes that the provider's intended meaning of "giveway" is not entirely clear, the fact that the provider documented this finding in the context of petitioner's strength test suggests that "giveway" refers to give-way weakness.  Give-way weakness is "[s]udden loss of resistance during strength testing, unlike the smooth weakness seen in organic conditions."  A finding of give-way weakness on examination can be a diagnostic indicator of Functional Neurological Disorder, which is "a condition characterized by neurological symptoms that are genuine and disabling, but which arise from alterations in nervous system functioning rather than structural damage to the brain."  *Functional Neurological Disorder*, PHYSIOPEDIA, https://www.physio-pedia.com/Functional_Neurological_Disorder (last visited June 11, 2026).

[4] Respondent stresses that this occurred over six months post-vaccination and that, in the interim, petitioner had an encounter with an orthopedic surgeon at which her shoulder condition was not discussed.  (ECF No. 31, p. 3 (citing Ex. 2, p. 14).)  However, that encounter was a follow up encounter for a knee condition and the physical exam is explicitly limited to the right knee.  (Ex. 2, pp. 14-15.) Although intervening encounters like this are sometimes probative with respect to the initial onset of an alleged SIRVA, I do not find this encounter informative regarding the issues discussed herein. Respondent notes that petitioner returned to the same physician again on April 26, 2022 (ECF No. 31, p. 3 (citing Ex. 2, p. 13)); however, the record of that encounter is likewise focused on petitioner's knees (Ex. 2, pp. 12-13.)

## IV.    Expert Reports

On petitioner's behalf, Dr. Natanzi[5] opines that the medical records are clear in identifying petitioner's post-vaccination pain and in placing it immediately after vaccination, *i.e.* within 48 hours of the vaccination.  (Ex. 8, p. 3.)  He opines:

> [Petitioner] presents with an immediate onset of radiating pain from the shoulder to the right upper extremity after vaccination.  Such a finding is not readily or typically attributed by most medical doctors to a shoulder injury. Instead, usually, such a finding initiates concerns about a potential neuropathic process, such as neuropathy, radiculopathy, or another peripheral nerve injury.  While these symptoms are most commonly seen with neuropathy or radiculopathy, there is no evidence of either in [petitioner's] medical record.  Instead, I propose that SIRVA, as described below and as made evident by the available medical literature, is befitting to describe the patient's exact presentation.

(*Id*. at 3-4 (internal citation omitted).)

Specifically, Dr. Natanzi cites a paper by Escobar et al. that identifies trigger points in the rotator cuff that can cause symptoms in the ring and little finger, where petitioner reported experiencing her radiating pain.  (Ex. 8, p. 4 (citing Pedro Luis Escobar & Julian Ballesteros, *Teres Minor: Source of Symptoms Resembling Ulnar Neuropathy or C8 Radiculopathy*, 67 J. PHYSICAL MED. & REHABILITATION 120 (1988) (Ex. 9)).)  Although petitioner had electrodiagnostic evidence of carpal tunnel syndrome, Dr. Natanzi notes such findings can be found even when carpal tunnel syndrome remains subclinical and opines carpal tunnel syndrome would be an unlikely explanation for symptoms affecting the 4th and 5th digits, as in petitioner's case. (*Id*. at 3.)  He further notes that petitioner's shoulder pain is inconsistent with carpal tunnel syndrome.  (*Id*.) Dr. Natanzi cites three additional papers for the proposition that rotator cuff needle overpenetration can result in symptoms affecting the arm and hand.  (*Id*. at 4 (citing Gokcan Okur et al., *Magnetic Resonance Imaging of Abnormal Shoulder Pain Following Influenza Vaccination*, 43 SKELETAL RADIOLOGY 1325 (2014) (Ex. 10); S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 VACCINE 8049 (2010)

---

[5] Dr. Natanzi received his Doctor of Osteopathy in 2012 from Western University of Health Sciences in Pomona, California.  (Ex. 31, p. 2.)  In 2013, he completed a traditional rotating internship at Downey Regional Medical Center in Downey, California.  (*Id.* at 1.)  Thereafter, Dr. Natanzi completed a residency in physical medicine and rehabilitation at the University of California, Irvine, serving as chief resident in his final year.  (*Id.*)  He then completed a fellowship at the Bodor Clinic in Napa, California.  (*Id.*)  Dr. Natanzi is board-certified in physical medicine and rehabilitation and pain management.  (*Id.*; Ex. 8, p. 1.) He maintains his license to practice medicine in California.  (Ex. 31, p. 4.)  Currently, Dr. Natanzi serves as a staff physician at VA Long Beach Healthcare System and is the found of the Regenerative Sports and Spine Institute in Sherman Oaks, California.  (*Id.* at 1; Ex. 8, p. 1.)  In his clinical practice, Dr. Natanzi almost exclusively treats musculoskeletal issues and regularly diagnoses and treats shoulder pathologies. (Ex. 8, p. 1.)

(Ex. 11); Levent Bayam et al., *Pain Mapping for Common Shoulder Disorders*, 40 AM. J. ORTHOPEDICS 353 (2011) (Ex. 12)).)[6]

In response, Dr. Cagle[7] opines on respondent's behalf that,"[t]he third qualifying factor for a SIRVA is not achieved as there is no objective evidence of new onset loss of shoulder motion." (Ex. A, p. 4.) Although the physical therapist documented reduced range of motion, Dr. Cagle "strongly" objects to that data, indicating

> Physical therapists are trained in the art of treating a patient after they have been examined and diagnosed. They are not trained in examination and diagnosis as a physician would be. As such, they are not held accountable for making an accurate diagnosis or measurement in the same way. What this means is that we cannot use a physical therapy measurement in isolation as proof of true pathologic shoulder loss of range of motion.

(*Id.*)

Dr. Cagle also stresses that petitioner was never diagnosed as having any injury of the shoulder. (Ex. A, p. 4.) Instead, "when we look at the gold standard test for a neurologic condition (the EMG), the test findings are consistent with bilateral carpal tunnel syndrome. Furthermore, no diagnostic shoulder workup is ever conducted." (*Id.*) Dr. Cagle remarks that "[i]t seems very unlikely that [the] petitioner had a significant shoulder pathology and this somehow was completely missed by Dr. Stone [the orthopedic surgeon referenced in note 4, *supra*]." (*Id.* at 4.) However, he acknowledges that Dr. Stone's workup was specifically related to petitioner's knee. (*Id.* at 4-5.) But, in any event, Dr. Cagle proposes that this raises the question of why someone with significant shoulder pain would forgo an appropriate workup when they clearly have access to orthopedic care. (*Id.* at 5.)

Dr. Cagle agrees with Dr. Natanzi that petitioner's symptoms affecting the 4th and 5th digits of the hand are not explained by carpal tunnel syndrome, that there is no EMG evidence of neuropathic changes, and that a radiculopathy has been ruled out. (Ex. A, p. 5.) However, although Dr. Cagle does not challenge the literature cited by Dr. Natanzi, he contends that it cannot reasonably be applied in this case. (*Id.*) The literature at issue discusses hand pain as sequela to impingement syndrome; however,

---

[6] Dr. Natanzi's report included a significantly longer bibliography and petitioner filed all of the cited articles (Exs. 13-20); however, only the four papers discussed above were specifically cited in the body of his report.

[7] Dr. Cagle earned his medical degree from Loyola University Chicago Stritch School of Medicine in 2008. (Ex. B, p. 1.) He completed a residency in orthopedic surgery at the University of Minnesota Academic Health Center and Medical School in 2013. (*Id.*) Thereafter, Dr. Cagle completed two fellowships in 2014: a shoulder and elbow fellowship at Mount Sinai Hospital in New York, New York, and a shoulder fellowship at Private Hospital Jean Mermoz/Centre Orthopaedic Santy in Lyon, France. (*Id.*) He is board-certified in orthopedic surgery. (*Id.* at 2.) Currently, Dr. Cagle serves as an associate professor and associate program director of the Department of Orthopedic Surgery at the Ichan School of Medicine at Mount Sinai. (*Id.* at 1; Ex. A, p. 1.) He has co-authored over 100 publications. (Ex. B, pp. 4-16.) In his clinical practice, Dr. Cagle almost exclusively treats patients with shoulder pathologies. (Ex. A, p. 2.)

there is no evidence this petitioner had impingement syndrome.  (*Id*.)  Moreover, Escobar et al., although it showed symptoms affecting the 4th and 5th fingers, cannot explain petitioner's presentation because it involved an injection into the posterior teres minor, which would be "nothing short of absurd for a vaccination."  (*Id*. at 5-6.)

In reply, Dr. Natanzi notes that Dr. Cagle merely assumes that the absence of specific range of motion findings indicates a normal range of motion; however, this is a "very flawed" assumption given the lack of any proper shoulder exam or good orthopedic exam.  (Ex. 33, p. 1.)  Dr. Natanzi also disagrees with Dr. Cagle's assessment of the abilities of physical therapists, suggesting physical therapists often take more accurate range of motion measurements than physicians, because they typically use a goniometer.  (*Id.*)  In petitioner's case, her physical therapist likely used a goniometer given that there was a precise measure of 145 degrees of motion.  (*Id*. (citing Ex. 4, p. 43).)  Moreover, internal rotation and flexion were both limited by approximately 20% when compared to normal.  (*Id.*)  Even if one assumed physical therapists were less reliable in their measurements, it is unlikely that they would mistake normal range of motion for a 20% limitation.  (*Id*. at 1-2.)  Thus, Dr. Natanzi finds it "inconceivable" to assume that petitioner did not have reduced range of motion.  (*Id*. at 2.)

In sum, Dr. Natanzi finds it significant that petitioner had no prior history of shoulder pain, that she experienced an immediate post-vaccination onset of shoulder pain, and that she had a loss of range of motion.  (Ex. 33, p. 2.)  Given that, Dr. Natanzi believes his parallel to the case reports cited in his initial report are reasonable.  (*Id.*)  In response to Dr. Cagle's criticism, he stresses that petitioner was never tested for impingement syndrome.  (*Id.*)

## V.    Analysis

This case is greatly complicated by petitioner's lack of orthopedic follow up for her alleged injury.  Given the lack of orthopedic evaluation, the evidence is quite limited. However, as discussed above, in order to demonstrate a Table SIRVA, petitioner need only demonstrate that her injury is consistent with the four QAI criteria for SIRVA.  If the injury is consistent with all four, then it "shall" be considered a SIRVA.  42 C.F.R. § 100.3(c)(10).

Of those four criteria, only one remains at issue.  That is, there is no dispute that petitioner had no history of pain or dysfunction of her shoulder, there is no dispute that she experienced a new onset of shoulder pain within the required timeframe, and respondent has not identified any other condition that explains her symptoms (indeed, Dr. Cagle specifically agreed that carpel tunnel syndrome, radiculopathy, or neuropathic changes are not implicated in this case (Ex. A, p. 5)).

Thus, petitioner's entitlement to compensation turns on the third SIRVA QAI criterion, whether her "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered."  42 C.F.R. § 100.3(c)(10)(iii).   This SIRVA requirement encompasses two considerations, both of which are contested in

this case.  First, this criterion requires an affirmative showing that the petitioner's presentation included a reduction in range of motion.  *Bolick v. Sec'y of Health & Human Servs.*, No. 20-893V, 2023 WL 8187307, at *6-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023).  Second, petitioner's presentation of pain and reduced range of motion must be reflective of a condition "localized to the shoulder in which the vaccine was administered."  *Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *12 (Fed. Cl. Spec. Mstr. May 2, 2023) (quoting 82 Fed. Reg. 6294, 6296).

Regarding the first requirement, I credit petitioner's physical therapy record as documenting the requisite reduction in range of motion.  (Ex. 4, p. 43.)  Physical therapy records are routinely trusted in this program as medical records and range of motion measurements are a routine part of a physical therapist's assessment.  *E.g.*, *Grieshop v. Sec'y of Health & Human Servs.*, No. 14-199, 2015 WL 4557620, at *5 (Fed. Cl. Spec. Mstr. June 5, 2015) (explaining that "the physical therapist noted that Petitioner had some abnormalities and weakness, including decreased muscle control and decreased stability with resistance.  These are contemporaneous findings the therapist made – not simply Mr. Grieshop's reporting of how he felt – and are therefore properly afforded some weight." (internal citation omitted)).  The fact that this measurement occurred late in the course of petitioner's treatment is immaterial.  *Gurney v. Sec'y of Health & Human Servs.*, No. 17-481V, 2019 WL 2865490, at *6 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (explaining that whereas the second SIRVA criterion requires that pain occur within 48 hours, the third criterion does not provide any specified timeframe for onset of reduced range of motion).

Dr. Cagle contends that "[p]hysical therapists are trained in the art of treating a patient after they have been examined and diagnosed.  They are not trained in examination and diagnosis as a physician would be."  (Ex. A, p. 4.)  Importantly, however, the SIRVA QAI criteria do not place any burden on petitioner to demonstrate a specific diagnosis.  Accordingly, the physical therapist's measurement of range of motion is not being relied upon for any diagnostic significance.  It only confirms the fact of the reduced range of motion.  And on that point, Dr. Natanzi is more persuasive than Dr. Cagle in suggesting that physical therapists are well equipped to conduct routine range of motion measurements.  (Ex. 33, pp. 1-2.)  Dr. Cagle's point might have carried more weight had there been actual contradictory assessments from an orthopedist; however, that is not the record of this case.

This leaves only petitioner's overall pattern of radiating pain as confounding of her Table SIRVA.  Parsing this requirement can be challenging.  While petitioner's condition must be localized to the shoulder, *e.g.*, *Durham*, 2023 WL 3196229, at *12, that does not mean that "a petitioner experiencing pain in the shoulder in addition to pain elsewhere is foreclosed from entitlement because the pain is not limited only to the shoulder."  *Chu v. Sec'y of Health & Human Servs.*, 180 Fed. Cl. 37, 76 (2026).  Rather, "so long as petitioner has *one* condition localized to the shoulder, SIRVA is satisfied." *Id.* (citing 82 Fed. Reg. 6294, 6296); *see also Werning v. Sec'y of Health & Human Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QIA criterion where there was a

10

complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder").

Thus, "prior decisions have indicated that some incidentally reported symptoms beyond the confines of the shoulder may not be dispositive of the nature of the petitioner's injury." *Durham*, 2023 WL 3196229, at *13.  This case, however, does not fit the mold of such prior cases.  Petitioner's symptoms radiating beyond her shoulder were a central feature of her presentation from the time of her initial presentation and were diagnosed by a neurologist as nerve pain. (*E.g.*, Ex. 1, p. 1 (vaccine administration record indicating that petitioner reported pain down her right arm on the same date as vaccination; Ex. 2, p. 31 (initial primary care encounter documenting right arm pain as the physical exam finding); Ex. 3, p. 4 (neurologist documenting petitioner was experiencing "lingering radiating pain down her right arm to her shoulder, forearm and right hand and fourth and fifth digit, after receiving a flu shot"); *Id.* at 5 (neurologist assessing petitioner with nerve pain).)  SIRVA, by contrast, even if it does not require any specific diagnosis, is by definition "not a neurological injury."  42 C.F.R. § 100.3(c)(10).  Moreover, as Dr. Cagle points out, there is no orthopedic assessment that confirms any shoulder pathology.  (Ex. A, pp. 4-5.)

Dr. Natanzi purported to cite literature that explains how petitioner's symptoms in her arm and hand could be sequela of a rotator cuff injury (Ex. 8, pp. 3-4); however, he ultimately agreed that most of the case reports involved impingement syndrome (Ex. 33, p. 2).  Yet, there is no evidence to support the proposition that petitioner suffered impingement syndrome.  Even accounting for Dr. Natanzi's observation that the lack of evidence of impingement is due to the lack of an orthopedic evaluation, it is very difficult to overlook the fact that petitioner repeatedly sought care from a neurologist rather than an orthopedist and specifically informed her physical therapist that she felt she was experiencing post-vaccination nerve pain because her injection hit a nerve.  (Ex. 4, p. 42.)  The reason there is no orthopedic evaluation is because petitioner (herself a nurse), by all indications, perceived her injury as neurologic rather than musculoskeletal and sought treatment accordingly.

Accordingly, petitioner's pain presentation extending beyond the confines of her shoulder cannot be characterized as merely incidental to her clinical presentation.  Indeed, petitioner's own expert agreed that

> [petitioner] present[ed] with an immediate onset of radiating pain from the shoulder to the right upper extremity after vaccination.  Such a finding is not readily or typically attributed by most medical doctors to a shoulder injury.  Instead, usually, such a finding initiates concerns about a potential neuropathic process, such as neuropathy, radiculopathy, or another peripheral nerve injury.

(Ex. 8, p. 3 (internal citations omitted).)  Petitioner is therefore not entitled to compensation for a Table Injury of SIRVA.

11

I also note briefly in the interest of completeness that, although petitioner neither pleaded nor argued any cause-in-fact claim, the record evidence would in any event not support such a contention. In the context of a Table SIRVA, petitioner had no obligation to characterize the injury at issue beyond demonstrating that she experienced pain and reduced range of motion limited to the affected shoulder. For a cause-in-fact claim, however, a petitioner must "must specify [her] vaccine-related injury and shoulder the burden of proof on causation." *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2010). "Although the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury – the Act specifically creates a claim for compensation for 'vaccine-related injury or death.'" *Stillwell v. Sec'y of Health & Human Servs.*, 118 Fed. Cl. 47, 56 (2014) (emphasis omitted) (quoting § 300aa-11(c)), *aff'd per curiam*, 607 F. App'x. 997 (Fed. Cir. 2015). "Medical recognition of the injury claimed is critical" and petitioner must assert "more than just a symptom or manifestation of an unknown injury." *Broekelschen*, 618 F.3d at 1349. Thus, although Dr. Natanzi cited a number of publications regarding shoulder injuries and SIRVA, petitioner's lack of orthopedic evaluation or diagnosis of any actual musculoskeletal shoulder injury would be fatal to a cause-in-fact presentation. Alternatively, petitioner might have endeavored to substantiate the idea that her diagnosed nerve pain was vaccine-caused. Certainly, her treating neurologist *tentatively* expressed that this may be possible. (*See* Ex. 3, p. 5.) Again, however, she neither pleaded nor argued that she suffered a vaccine-related neurologic injury. Moreover, nothing in Dr. Natanzi's report would support such a claim and petitioner has not filed any other expert opinion.

## VI.    Conclusion

Petitioner clearly suffered and she does have my sympathy. However, for all the reasons discussed above, there is not preponderant evidence of any compensable injury under the standards set by this program. Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

12